**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **KATHERINE BRUNER, DR. CRAIG** | ) | |
| **BRUNER, and their minor child, S.B.,** | ) | |
| **by through her parent and next** | ) | |
| **friend, KATHERINE BRUNER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CASE NO.** |
| | ) | |
| **THE PEMBROKE HILL SCHOOL,** | ) | |
| **BRAD SHELLEY and MIKE HILL,** | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

## COMPLAINT

COME NOW, PLAINTIFFS, KATHERINE AND DR. CRAIG BRUNER, and S.B. ("SB"), by and through KATHERINE BRUNER, as her parent and next friend, and for their Complaint against Defendants THE PEMBROKE HILL SCHOOL, BRAD SHELLEY AND MIKE HILL, allege and state as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction is proper pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.

2.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Western District of Missouri.

3.      Jurisdiction for declaratory and other equitable relief is invoked pursuant to 28 U.S.C. §§ 2201 and 2202. A declaration of the law is necessary and appropriate to determine the parties' respective rights and duties.

## THE PARTIES

4.     Plaintiffs Katherine and Dr. Craig Bruner are residents of Johnson County, Kansas, and are the parents and next friends of their minor daughter, SB, who resides with her family and is a Kansas resident.

5.     Defendant The Pembroke School ("Pembroke" or "School") is an elite private school located at 5121 State Line Road, Kansas City, MO 64112, organized and existing under Missouri law. Pembroke enrolls students separated into four sections: early years-prekindergarten (early childhood school"), kindergarten through 5th grade (lower school), 6th-8th grade ("middle school"), and 9th-12th grade ("upper school").

6.     Students attending Pembroke largely come from affluent families because of prohibitively expensive tuition which is comparable to many Missouri colleges and universities. Tuition and fees for the 2024–25 school year range from $18,685 for students up to pre-kindergarten to $30,465 for upper school.  Pembroke advertises that approximately 25 percent of students receive some form of financial aid, totaling more than $3.7 million each year.  For the tax year 2021, Pembroke lists total net assets of $155,722,000 and boasts an endowment of more than $38 million.  Pembroke also receives additional funding in the form of charitable donations in amounts ranging from comparatively modest to extremely generous contributions from the wealthiest families.

7.     Defendant Brad Shelley ("Shelley") as Pembroke's "Head of School." Shelley has school-wide decision-making authority on certain matters. including student discipline.  At relevant times, Shelley acted within the course and scope of his employment.

8.     Defendant Mike Hill ("Hill") is Pembroke's upper school Division Head.  Among other responsibilities, Hill has authority over student disciplinary matters within the upper school

2

pursuant to the policies and procedures adopted by the school. At all relevant times, Hill acted within the course and scope of his employment.

9.      As a private school, Pembroke is unconstrained by the obligations and requirements imposed by law on public schools.

10.     Pembroke is not required to receive accreditation, licensing or approval, its teachers and administrators need not be certified, have no professional development requirements, and students attending private school are not subject to general testing as are their public-school peers.

11.     Unlike Defendants Shelley and Hill, administrators in public schools typically hold post-graduate degrees in education and have years of experience before rising to building or district wide administration.

12.     Students attending public schools enjoy numerous legal rights and protections that private school students do not, including the right to notice and the opportunity to be heard before discipline is imposed, restrictions on the types and duration of discipline public schools are allowed to impose, and mandates the procedures they must follow.  *See* Mo. Rev. Stat. § 167.171.2, which states that no pupil shall be suspended unless:

> (1)  The pupil shall be given oral or written notice of the charges against such pupil;
>
> (2)  If the pupil denies the charges, such pupil shall be given an oral or written explanation of the facts which form the basis of the proposed suspension;
>
> (3)  The pupil shall be given an opportunity to present such pupil's version of the incident; and
>
> (4)  In the event of a suspension for more than ten school days, where the pupil gives notice that such pupil wishes to appeal the suspension to the board, the suspension shall be stayed until the board renders its decision, unless in the judgment of the superintendent of schools, or of the district superintendent, the pupil's presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process, in which case the pupil may be immediately removed from school, and the notice and hearing shall follow as soon as practicable.

3

13.     These and similar Missouri education statutes do not apply to Pembroke. It is almost entirely self-regulating and, thus, the rights of parents and students are contractual and/ or are left to its discretion.  As alleged in more detail below, that discretion is easily and often abused by school officials.

## FACTUAL ALLEGATIONS

14.     SB enrolled at Pembroke as a ninth grader for the 2023-24 school year.  She was fourteen at the time.

15.     SB's sister, EB, also enrolled at Pembroke as a ninth grader for the 2023-2024 school year and is still attending the School.

16.     SB's younger brother WB previously attended Pembroke but transferred after his fifth-grade year.

17.     SB has attended Pembroke since early childhood, and it is the only school she has ever known.

18.     Prior to the events alleged herein, SB had a spotless disciplinary record and was an excellent student.

### Pembroke's Summary Suspension of SB

19.     SB participated in athletics as a member of Pembroke's field hockey team.  She reported to practice with her teammates in August 2023.

20.     Pembroke's field hockey team began the playing season in early September and played their last game on October 28, 2023.

21.     Plaintiffs were never informed by anyone, including the coaching staff, that Pembroke had any concerns over or received a single complaint about SB's behavior on or off the field at any time during the entire field hockey season.

4

22.     Pembroke did not receive and therefore did not investigate any complaints about SB's conduct from teammates, other parents or any third parties at any time during the field hockey season.

23.     On October 31, 2023, without prior notice, Mike Hill told Katherine Bruner that, effectively immediately, SB had been suspended from school indefinitely for unspecified "egregious and inappropriate" conduct toward her teammates, the nature of which he refused to explain.

24.     Hill told Katherine Bruner that on October 30, the previous day, he received nondescript complaint[s] about SB's allegedly inappropriate behavior toward her teammates from an anonymous group of players, self-anointed as the so-called "senior leadership of the team."

25.     Pembroke never provided Plaintiffs with any information showing it bothered to meaningfully investigate the veracity of these complaints, interviewed coaches or other witnesses, or otherwise made any efforts to investigate these complaints.

26.     At their October 31, 2023 meeting, Hill refused to disclose to Katherine Bruner the specific language that SB was accused of using, state when and where the statement[s] were allegedly made, or to whom they were made.  Nor was he able or willing to provide Katherine Bruner with one concrete example of what he meant by "inappropriate and egregious."

27.     Hill's statement to Katherine Bruner that he had only just learned of the allegations the day before (October 30, 2023), shows that it was virtually impossible for Pembroke to meaningfully investigate allegations of misconduct against SB before suddenly suspending her indefinitely.

28.     The only written notice of the allegations against SB was an email from Hill to Katherine Bruner dated November 1, 2023.   Hill still refused to elaborate on or clarify the

5

accusations against SB, state the reasons why Pembroke had decided to impose the severe penalties of indefinite suspension and/or expulsion.  Hill only stated that:

> I'm writing to provide you with an update on our review of SB's behavior this year as a member of the PHS Girls Field Hockey team.  In the time since our initial conversation yesterday morning, we (Bill McGee, Amanda Lehotak, and I) have met with the coaches and many members of the team. And based on what we have learned thus far, I must tell you that we are unsure if Pembroke Hill is the right school for SB. Her behavior towards other members of the PHS community (her teammates) this season was egregious and unacceptable. I would like to schedule a meeting with you and SB at your earliest convenience. I think it's important that we hear from SB again, but I must add that it's equally essential for her to be truthful at that time, which I don't believe was the case when we met with her yesterday morning. Please respond with a few meeting options, and we will get back to you. SB will remain on suspension until this situation is resolved.

29.     As of November 6, 2023, Pembroke still had not provided Plaintiffs remotely specific notice of the nature the misconduct in which SB was alleged to have engaged or the disciplinary procedures and rights guaranteed students under Pembroke's Disciplinary Policies.

30.     Pembroke never specified the nature of SB's alleged misconduct, yet Hill misrepresented to Plaintiffs that Pembroke also acted out of purported concerns over "school safety" as another *post hoc* justification for his impulsive decision to expel SB for no legitimate reason, stigmatizing her even further in the process.

31.     Rather, on November 6, 2023, Hill simply told Katherine Bruner that SB would "need to find a new school or be expelled" without further elaboration.

32.     On November 8, 2023, Plaintiffs received SB's 2023 Enrollment Contract from Pembroke Hill School, still unsure of the School's position or intention.

33.     On November 14, 2023, Katherine Bruner met with Brad Shelley, Mike Hill and Bill McGee and was told that SB would not be allowed to return to complete the current semester.

6

They further represented that Brad Shelley would decide whether she could enroll or the second semester by Friday, November 17, 2023, but that if she were allowed back, she would be under heightened scrutiny and would be asked to leave at the "slightest misstep."

34.     In other words, Pembroke placed SB on its own version of "double secret probation" without notice, the opportunity to be heard or meaningful and fair process.

35.     The Bruners received no further communication from Pembroke beyond the ultimatum that they must either withdraw SB or she would be expelled; but Pembroke has yet to even explain how or why her suspension quietly morphed behind the scenes into a de facto expulsion.

36.     Pembroke never claimed that SB broke any school rule or violated the PHS Disciplinary Code.  Yet, it ultimately expelled SB for reasons it has never explained through an opaque star-chamber like process in violation of Pembroke's own policies and procedures.

37.     By suspending and later expelling SB in the manner alleged above, Pembroke has violated its contractual obligations to Plaintiffs.

38.     For example, Pembroke failed to follow its own policies and procedures set forth in the "Security Safety & Discipline" Section of the Pembroke student-handbook ("Student Handbook").  A copy of the relevant section of the Student Handbook is attached as **Exhibit A**.

39.     Pembroke's summary expulsion of SB and demand for payment from Plaintiffs violated the terms of the parties' enrollment and tuition agreement ("Tuition Agreement") because none of the conditions purporting to authorize Pembroke to expel a student and keep its money apply here. A copy of the Tuition Agreement is attached as **Exhibit B**.

7

40.     The Student Handbook is divided into sections setting forth applicable rules for academic integrity, harassment, discrimination, illegal substances, dangerous weapons guidelines, dress code, internet acceptable use statement, etc.

41.     The Student Handbook inaccurately describes Pembroke's philosophy of student discipline as "a developmental process. As an educational institution, we view discipline as a teaching and learning opportunity with a focus on restoring any harm caused."  It further promises to provide the student with notice and opportunity to be heard before imposing any form of discipline authorized by the Handbook.

42.     Pembroke falsely promises that "[i]n recommending or determining disciplinary action," Pembroke "may consider the student's present demeanor and past disciplinary record, the nature of the infraction, the severity of any damage, injury or harm resulting therefrom, while taking into account the best interest of the school."   Pembroke's failure to clearly explain its decision to expel SB strongly suggests it failed to take a single of these factors into consideration.

43.     The Handbook authorizes imposition of discipline that should be "applied with a restorative lens," and states that "disciplinary action for a first offense may include:  verbal warning and parental notification; education on the topic of harassment; counseling; detention; or suspension." *Id*.

44.     Pembroke claims to afford students accused of misconduct procedural protections, including the right to a formal hearing before the Student Honor Council ("Honor Council"), which is comprised of four to six students and four to five faculty members, and a chair appointed by the upper school division head. The students are members of the junior or senior class.

45.     The Honor Council was established to hear and resolve "cases regarding student disciplinary action that are serious or chronic in nature and makes recommendations to the division

8

head concerning student violations of school policy." Id. The Council may be called into session at the request of the division head or by student petition.

46. The Honor Council may recommend that a student be suspended from school for one to 10 days or place a student on disciplinary probation who has committed serious or repeated violations of school policies. Disciplinary probation means a repeat of the violation that caused the student to be placed on probation could result in the student's dismissal. In addition, any violations of other policies will also be considered very serious and may result in the recommendation that a student be dismissed; hears recommendations for changes in disciplinary policy and procedures, and "[a]cts as a grievance committee for a student who feels he or she has been unfairly treated in a case involving disciplinary action."

47. Even where no student petition is made, the Handbook mandates that "[a]ll offenses that could lead to a suspension or dismissal will be brought before the Honor Council unless both the division head and the involved parties agree to have the matter resolved by the division head, and the student does not have a prior Code of Conduct violation." (Emphasis added).

48. SB did not have a prior Code of Conduct violation.

49. SB was never accused of violating any provisions in the Code of Conduct in connection with the discipline imposed in the instant case.

50. Neither Plaintiffs nor SB were informed of the procedures and protections SB was entitled to under the Student Handbook, including the right to a hearing before the Honor Council.

51. Pembroke also failed to give Plaintiffs and SB meaningful notice of the nature of the alleged "egregious and inappropriate" behavior. The opaque reasons Hill did provide referenced a made-up song and use of vaguely stated words or phrases that could be perceived as

9

anti-LGBTQ. Hill appears to have made this determination based on statements and admissions made by SB when Hill interrogated her outside the presence of her parents present.

52.     Hill essentially coerced a confession from a frightened fourteen-year-old girl who, when questioned, tried her best to please him and speculate aloud about what she might have said or done to offend anyone.

53.     Even assuming SB had made clearly offensive and harassing remarks to another student, such conduct would fall under the "harassment" as defined in the Student Handbook, for disciplinary action for a first offense starts with simply counseling the students. A student accused of harassment is also entitled to a hearing before the Honor Council and the Student Handbook does not authorize expulsion for such violations.

54.     Furthermore, the Tuition Agreement allows for only four grounds under which Pembroke may expel a student:

> (1) the student violates the Code of Conduct or policies pertaining to discipline and harassment/discrimination contained in the Student Handbook; (2) the student's conduct at school or away is detrimental to the School; (3) the student's and/or the student's parents/guardians' actions are not supportive of this positive relationship or do not abide by the School's policies and rules or otherwise seriously interfere with the School's accomplishment of its mission and educational purpose; or (4) the student's academic progress is unsatisfactory.

55.     Pembroke did not rely or even purport to rely on any of the foregoing terms in connection with its suspension and expulsion of SB. Even if it had, it would still have breached the plain terms of the Tuition Agreement and its obligations to Plaintiff because none of the four grounds stated above apply here.

56.     The first condition does not apply because the school never alleged that SB violated the Code of Conduct or the student handbook. Similarly, Pembroke never claimed the expulsion

10

was due to unsatisfactory academic progress—and it is undisputed that SB was and is an excellent student—so the fourth condition is not present.

57.     The second and third conditions allowing Pembroke to expel a student is "detrimental" to the school or one who is not sufficiently "supportive of this positive relationship" are far too subjective, overly broad and ambiguous, essentially giving Pembroke unlimited authority to expel students any time for any reason and still collect a full year's tuition.  And the fourth condition cannot apply because SB maintained an excellent academic record.

58.     Accordingly, Pembroke had no contractual right to expel SB and claim entitlement to an entire year's tuition, costs and pre-paid expenses.

59.     More specifically, the Tuition Agreement states the amount of tuition and costs paid to enroll the student, the deadline by which payment is due, and notes the penalties Pembroke may impose for non-payment:

> If the tuition, fees and other charges are not paid in full when due, finance charges of 10% per annum are assessed. The student may not be permitted to attend classes unless special arrangements for payment have been previously agreed to in writing by the School. Payments returned by the bank due to insufficient funds, etc. will incur a $30 processing fee. In the event of a dispute regarding tuition, fees, or charges of any kind, the School shall be entitled to recover its attorneys' fees and costs incurred in such a dispute.

**Exhibit B**.

60.     Because Pembroke claims the right to payment of a full year's tuition even if a student attends just one-day of class, the Tuition Agreement essentially reserves Pembroke the right to expel any student, at any time and for any reason still full collect tuition for educational services it never renders and parents must pay for a school their student is unable to attend.

61.     The Tuition Agreement further gives Pembroke the right to withhold transcripts, grades, diplomas and school records until all family financial obligations to the school have been

11

met. Pembroke also threatens to report alleged student disciplinary violations to college and university admission offices.

62.     Pembroke's Tuition Agreement for the 2023-24 school year contained no provision or allowance for a tuition refund.

63.     On or about January 10, 2024, Pembroke revised its tuition payment policy for the 2024-2025 school year to permit partial tuition refunds. **Exhibit C**.  But a closer reading of the new policy revels merely another layer of illusory promises.  The policy is carefully written to ensure there are no circumstances that obligate Pembroke to refund a dime, even though all parents are required to purchase "tuition insurance" for a refund they may never receive.

64.     As alleged above, the statements attributed to SB are not grounds for discipline under any provision of the Student Handbook or the termination clause of the Tuition Agreement.

65.     According to the Student Handbook, a student who harasses someone can be punished with a verbal warning, education on harassment, counseling, detention, or suspension. If they are a repeat offender, a hearing before the Honor Council is required, which can recommend a suspension from 1 to 10 days or put them on probation. If they violate the rules while on probation, they may be dismissed from school. Expulsion is not a specified consequence for harassment. Expulsion is not authorized for such violations.

66.     Where a private school agrees to provide such procedural protections to students, it assumes a contractual obligation to provide that process before imposing disciplinary measures.

67.     Upon information and belief, Pembroke upper and middle school administrators favor certain students over others.  For example, recently, Pembroke took no disciplinary actions against a student who broke another student's wrist on school grounds, in front of witnesses, and

12

then bragged about it. Another male student was caught having prepared a "kill list" of other students but received a short suspension before returning to school (which he continues attending).

68. Pembroke's practice is not to disclose the details regarding instances of student misconduct under the guise of compliance with education privacy laws, which may be easily translated into a custom and practice of covering up incidents involving certain students or ones which make for poor optics.

69. Pembroke follows and pattern and practice of disparate treatment of and favoritism toward students perceived as "popular" or whose parents may be among the wealthiest donors to the school. In contrast, Pembroke can exploit its lax to non-existent disciplinary procedures and contractual leverage to cause parents to withdraw their children under threat of expulsion, or event to permanently expel students like SB without notice of the reasons or the opportunity to be heard.

70. Another coercive tactic Pembroke employs is threatening to make fabricated or minor rules violations part of a student's "permanent record." *See* **Exhibit B** ("Pembroke Hill is a member of the National Association for College Admission Counseling (NACAC) and supports NACAC's Statement of Principles of Good Practice.").

71. Therefore, the school will, when requested on the institution's application, report student conduct records to colleges and notify colleges of any significant changes in the student's academic or personal status between the time of application and graduation. This includes, but is not limited to, serious disciplinary violations, honor violations, probation, suspension, dismissal or a significant drop in grades.").

72. Pembroke administrators have also openly attempted to interfere with families trying to transfer their children to public schools by withholding records, grades and providing misinformation regarding enrollment eligibility.

13

73.     The foregoing acts and omissions have caused Plaintiffs to incur significant monetary damages, conduct which was also intentional and directly caused SB to suffer considerable emotional distress, pain and humiliation, requiring medical intervention, including psychiatric treatment and counseling.

## COUNT I

### (Breach of Contract against Defendant Pembroke)

74.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-73 above as if fully set forth herein.

75.     The Student Handbook and the Tuition Agreement form, as well as Pembroke's other representations and promises, together formed a contract between the parties.

76.     The foregoing document, which constitute the Agreement, were drafted by Pembroke and/or its counsel and the terms were non-negotiable, and any ambiguities are to be construed against it.

77.     For the same reason, the Agreement constitutes an adhesion contract under Missouri law.

78.     Pembroke breached the parties' Agreement by failing to follow its own disciplinary policies and procedures before suspending and then expelling SB.

79.     Pembroke breached the parties' Agreement by imposing the penalty of expulsion on SB that is not authorized under either Pembroke's Disciplinary Code or the terms of the Tuition Agreement.

80.     Pembroke breached the parties' Agreement by failing to provide SB with the quality education services it promised but failed to deliver.

81.     Plaintiffs have fulfilled their obligations under the agreement.

82.     Defendant's acts and omissions alleged herein constitute a prior for breach of its material obligations under the parties' agreement.

83.     Further, Pembroke acted arbitrarily and capriciously at every stage of its disciplinary actions against SB and in so doing materially breached the parties' agreements and understandings.

84.     As a direct and proximate result of Pembroke's breaches of contract, Plaintiffs have been damaged.

## COUNT II
### (Promissory Estoppel against Pembroke)

85.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-84 above as if fully set forth herein.

86.     Pembroke made clear and unambiguous promises to Plaintiffs to provide SB with a superior education.

87.     Pembroke made clear and unambiguous promises that it provides students with fair and equitable student-disciplinary procedures.

88.     Plaintiffs reasonably relied to their detriment on Pembroke's promises and representations.

89.     Pembroke expected, or reasonably should have expected Plaintiffs' reliance.

90.     Defendants' conduct as alleged herein has caused an injustice to occur.

91.     Further, Pembroke's adoption of a new tuition refund policy evidence it knew the policy it threatens to enforce against Plaintiffs was unfair, inequitable and misleading.

92.     Plaintiffs have suffered damages as a direct and proximate result of Pembroke's actions.

## COUNT III

### (Unjust Enrichment against Pembroke)

93.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-92 above as if fully set forth herein.

94.     As a direct result of the actions described above, Pembroke was unjustly enriched at the expense of Plaintiffs.

95.     Plaintiffs paid roughly $506,000 in total tuition and charitable donations for their children to attend Pembroke.  For SB alone, they paid around $208,250.

96.     Total tuition, fees and costs for the current school year totals $30,470.52.  Plaintiffs have already paid Pembroke $22,085.50, of which $2,901.50 is described as a non-refundable deposit, in addition to nearly $5,000 prepaid for a school sponsored trip SB was unable to attend.

97.     In the 2023-24 school year, SB was able to attend Pembroke for only 50 days, with approximately 119 days remaining in the school year at the time she was suspended.  Annual tuition of $30,470.52 for the full 169 days of the current school years equals about $180.00 per day.

98.     In other words, Pembroke claims it is still entitled to $21,455.70 in tuition for the 119 days of school that SB is unable to attend due to Pembroke's arbitrary and capricious actions.

99.      Plaintiffs conferred benefits on Pembroke that Pembroke accepted and enjoyed.

100.    Pembroke accepted and retained such benefits under inequitable and/or unjust circumstances.

101.    As a result of the unjust enrichment described above, Plaintiffs and SB have suffered substantial direct and consequential monetary damages in an amount to be determined at trial.

<u>**COUNT IV**</u>

**(Missouri Merchandising Practices Act against Pembroke)**

102.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-101 above.

103.    Section 407.020 of Missouri's Merchandising Practices Act ("MMPA") provides in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

104.    Under Section 407.025 of the MMPA, "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020" may bring a civil action against the party who violated the Act.

105.    Section 407.010(4) defines "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate *or services*." (Emphasis added.)

106.    Section 407.025 further states that "[i]f the court finds that the method, act or practice declared unlawful by section 407.020 has caused the plaintiff to suffer an ascertainable

17

loss of money or property, the plaintiff may recover, in addition to damages, an award of reasonable attorneys' fees and other costs of the action."

107.    Plaintiffs purchased merchandise in the form of educational services from Pembroke for personal, family and household purposes.

108.    Pembroke used deception, fraud, false pretense, false promise, misrepresentation and/or unfair practice, and/or concealed, suppressed or omitted a material fact in connection with its representations to Plaintiffs.

109.    The Plaintiffs relied to their detriment on Pembroke's promise to provide its students with a fair and equitable student disciplinary process.

110.    As a direct and proximate result of Pembroke's violation of the MMPA, Plaintiffs have suffered an ascertainable loss of money or property.

111.    The Plaintiffs relied to their detriment on Pembroke's misrepresentations regarding the quality and nature of the education to be provided, the costs of tuition and attendance, the promise to provide students with procedural protections from random acts of discipline and/or expulsion.

112.    Pembroke's conduct was outrageous because of Defendants malicious motives, and/or made with disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

## COUNT V
### (Good Faith and Fair Dealing against Pembroke)

113.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-112 above.

114.    The covenant of good faith and fair dealing is implied in every contract, including Pembroke's agreement to provide Plaintiffs with educational services.

18

115.     Pembroke had a duty to exercise discretion in such a manner as to not evade the spirit or the transaction or deny Plaintiffs' their expected benefit of the bargain.

116.     Pembroke breached of the covenant of good faith and fair dealing when it claimed to follow the express terms of the parties' agreement but did so in such a manner as to evade the spirit of the transaction and deny Plaintiffs their expected benefit of the contract.

117.     The agreements at issue are intentional designed to enable Pembroke to evade its contractual obligations through the exercise of unfettered discretion, allowing the school to treat students and families arbitrarily or unfairly when to do so serves its own economic interests.

118.     Pembroke regularly exploits various contract provisions to intimidate parents by threatening to withhold student transcripts.

119.     Pembroke regularly exploits various contract provisions to intimidate parents to withdraw their child "voluntarily" or face suspension or expulsion, yet still expects them to pay full tuition.

120.     Pembroke regularly exploits various contract provisions to intimidate parents by including an attorney's fee-shifting clause in the Tuition Agreement in the event a dispute arises, allowing it to breach its obligations with even greater impunity.

121.     Pembroke regularly exploits various contract provisions to intimidate parents by threatening to withhold student transcripts, grades and similar educational records unless and until parents relent and pay the amount it demands.

122.     Pembroke regularly exploits various contract provisions to intimidate parents by threatening to give their child a "disciplinary record" the school states will be reported to any college and university to which they may apply.

19

123.    Pembroke breached its duty of good faith and fair dealing by failing to follow its own disciplinary rules and procedures and by expelling SB in violation of the relevant provisions of the Tuition Agreement.

124.    Pembroke further breached its duty of good faith and fair dealing by failing to even inform Plaintiffs that SB had a right to avail herself of those same rules and procedures, including the right to a hearing before the Honor Council.

125.    Pembroke further breached its duty of good faith and fair dealing by falsely claiming its expulsion of SB and demand for unpaid tuition was authorized under and consistent with the terms of the Tuition Agreement.

126.    At all relevant times herein, Pembroke acted in bad faith, arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of Plaintiffs.

127.    Plaintiffs have been damaged as the direct and proximate result of Pembroke's breaches of its duty of good faith and fair dealing.

## COUNT VI
### (Intentional Infliction of Emotional Distress—all Defendants)

128.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-127 above.

129.    Defendants breached their duties to SB by allowing coaches and administrators to mistreat her, single her out for s humiliation in front of her teammates, call her "autistic," and by interrogating SB outside the presence of Plaintiffs, dismissing her from school in the middle of the day, telling her to clean out her locker and find a way home when she was in visible emotional distress from the sudden indefinite suspension for reasons beyond her understanding.

130.    Defendants knowingly and intentionally failed to follow Pembroke's disciplinary policies and procedures with the intention to "separate" SB from the school either be coerced withdrawal or expulsion.

131.    Defendants deliberately refused to inform Plaintiffs of any concerns or problems with SB's behavior before indefinitely suspending her,

132.    Defendants intentionally refused to explain to Plaintiffs the specific conduct of which SB was accused and failed to keep them informed of Pembroke's behind the scenes decision to expel her.

133.    Defendants intentionally and falsely represented that SB was disciplined for reasons relating to "school safety."

134.    The form of discipline Defendants imposed on SB is grossly disproportionate to the misconduct that Defendants claimed occurred.

135.    Defendants were deliberately indifferent to acts of serious misconduct by other students, who were either lightly disciplined or not disciplined at all, including failing to impose any penalty on a student who inflicted a serious physical injury on another and then bragged about it to others.

136.    Another male student was caught having prepared a "hit list" of other students he was planning to kill.  He received only a brief suspension.

137.    Pembroke's failure to apply its disciplinary policies and procedures consistently and uniformly to all students made Defendants' treatment of SB all the more arbitrary and capricious.

138.    Defendants' acts and omissions were willful, wanton and malicious.

139.    Defendants knew or should have known their intentional acts would foreseeably inflict severe humiliation and emotional distress on SB.

140.    The emotional distress suffered by SB was of such a nature that it would be reasonably expected to result from the extreme and outrageous conduct of Defendants.

141.    As a direct and proximate result of Defendants' conduct, SB suffered severe emotional distress and injury requiring ongoing medical intervention, therapy and counseling,

142.    Plaintiffs have been damaged as the direct and proximate result of Defendants' acts and omissions.

143.    Defendants' conduct was outrageous and the result of evil motive, and or made with reckless disregard for the rights of Plaintiffs, entitling them to an award of punitive damages.

## COUNT VII

### (Negligent Infliction of Emotional Distress—all Defendants)

144.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-143 above.

145.    Defendants acted negligently by suspending SB without first conducting a meaningful investigation into the allegations against her.

146.    Defendants acted negligently by failing to follow Pembroke's own disciplinary policies and procedures before summarily placing SB on indefinite suspension and subsequently expelling her, never providing an explanation the reasons for most severe form of discipline a school can impose on a student.

147.    The form of discipline Defendants imposed on SB is grossly disproportionate to the misconduct that Defendants claimed occurred.

148.    Defendants' sudden imposition of this severe penalty on SB may cause third parties to falsely believe that her behavior must have been extreme and outrageous when it was not.

149.    Defendants' sudden imposition of this severe penalty on SB will reasonably cause others to falsely infer that SB's misconduct must have presented a threat to school safety or similarly serious violation to merit expulsion when it did not.

150.    Among other things, it is more likely than not that colleges and universities to which she applies may draw the same inference, causing SB fear and apprehension of the very real possibility that Defendants' negligent acts have damaged her chances of admission.

151.    Defendants were negligent in the manner which accused, investigated and convicted SB without providing meaningful notice of the conduct she was accused of, or informing them of recourse Pembroke promises but failed to deliver.

152.    The injury suffered by SB was the reasonably foreseeable and expected result of Defendants' acts and omissions.

153.    Defendants knew or should have known their acts and omissions would foreseeably and reasonably cause emotional distress on SB.

154.    As a direct and proximate result of Defendants' conduct, SB has experienced emotional distress sufficiently severe to require medical and therapeutic intervention.

155.    SB has been damaged as a direct and proximate result of Defendants' acts and omissions alleged herein.

## COUNT VII
### (Declaratory Judgment against Pembroke)

156.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-155 above.

157.    An actual controversy has arisen and exists between the parties concerning their respective rights and obligations under the parties' Agreement.

23

158.    A declaration from this Court is necessary to resolve disputed issues for which there is no contractual or other remedy at law.

159.    A declaratory judgment is both necessary and appropriate to establish that Pembroke cannot lawfully expel SB and collect the full year of tuition for classes SB will not be able to attend due to Defendants' wrongful acts.

160.    A declaratory judgment is both necessary and appropriate to establish that Pembroke cannot lawfully enforce the fee shifting provision in the Tuition Agreement as a matter of contract law and public policy.

161.    A declaratory judgment is both necessary and appropriate to establish that Plaintiffs are entitled to a full refund of tuition and costs they have already paid for the 2023-24 school year.

162.    A declaratory judgment is both necessary and appropriate to determine whether the Agreement's language purporting to reserve Pembroke's right to expel students any time for any reason renders its obligations illusory and its claimed contractual rights unenforceable against Plaintiffs.

163.    A declaratory judgment is both necessary and appropriate to establish that Pembroke is barred from enforcing the Agreement because it committed a prior first material breach.

164.     A declaratory judgment is both necessary and appropriate to establish that SB is entitled to the removal of the foregoing incidents and disciplinary actions from her educational records.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants and enter the following relief:

A.   For compensatory damages in whatever amount may be proven at trial under state and federal state law;

B.   For entry of a declaratory judgment on the parties' respective contract rights as alleged herein above;

C.    For punitive damages in an amount to be proven at trial;

D.   For pre- and post-judgment interest as allowed by law;

E.   For reasonable attorneys' fees;

F.   For costs of suit; and

G.   For such further other relief as the Court may deem just, proper, and appropriate.


Respectfully submitted,


/s/ *William C. Odle*
William C. Odle    MO Bar #38571
The Odle Law Firm, LLC
6 ½ East First Street, Suite 2
Parkville, MO 64152
Tel: (816) 631-5220
wodle@odlelawfirm.com
ATTORNEY FOR PLAINTIFFS